UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DEREK LEE, | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. 3:10-cv-00538 |
| | § | |
| CREDIT MANAGEMENT, LP | § | |
| (erroneously named as Credit | § | |
| Management, LP dba The CMI Group), | § | |
| Defendant | § | |

**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

COUNSEL FOR DEFENDANT:

Robbie Malone
State Bar No. 12876450
Jacob C. Boswell
State Bar No. 24061269
Robbie Malone, PLLC
NorthPark Central, Suite 1850
8750 North Central Expressway
Dallas, Texas   75231
214.346.2625 (Direct Dial)
214.346.2631 (Fax)
<u>rmalone@rmalonelaw.com</u>

## TABLE OF CONTENTS

I.      FACTS………………………………………………………………………1

II.     SUMMARY JUDGMENT STANDARD………………………………………4

III.    ARGUMENT AND AUTHORITIES………………………………………...5

        A.      Plaintiff's Claim Under the Telephone Consumer Protection Act……………5

                1.      The TCPA Does Not Apply to Debt Collection Activities………………..5

                2.      Plaintiff Has Not Properly Pled a Cause of Action Under the TCPA…….7

                3.      The TCPA Must Be Applied According to Texas Law…………………..8

                4.      Texas Law Only Applies the TCPA to Calls "Received"………………..11

                5.      Plaintiff Consented to the Calls from CM……………………………17

                6.      Debt Collection Calls Do Not Satisfy the TCPA's Definition of
                        "Automatic Telephone Dialing System"………………………………...19

                7.      Plaintiff Admits CM Did Not Use an Artificial or Prerecorded Voice…..23

                8.      Plaintiff Was Not "Charged" for CM's Calls as Required
                        by the TCPA……………………………………………………………...24

        B.      Plaintiff's Claims under the Fair Debt Collection Practices Act……………27

                1.      CM Did Not Harass or Abuse Plaintiff in Violation of § 1692d………..27

                        a.      Plaintiff Failed to Offer Any Evidence Showing a
                                Violation of § 1692d(2)……………………………………..28

                        b.      Plaintiff's Evidence of the Volume and Pattern of Calls
                                Fails to Raise a Material Issue of Fact under § 1692d(5)……….29

                2.      Plaintiff has Failed to Show that CM Made Any
                        False Representations……………………………………………………35

                        a.      CM Did Not Misrepresent the Debt Amount in violation
                                of § 1692e(2)(A)……………………………………………35

b.  *CM Did Not Employ Deceptive Means in violation of §*
    *392.304(a)(19)*……………………………………………………………...40

c.  *CM Used No Other False Representations Violating*
    *§ 1692e(10)*…………………………………………………………………41

3.  CM Provided the Notices Required by § 1692g(a)………………………41

**C.   Plaintiff has Failed to Prove His Claim Under the DTPA**……………………...43

**D.   Plaintiff has Failed to Prove His Damages Claims**…………………………...45

1.  Plaintiff Presents No Evidence of "Actual Monetary Loss"
    under the TCPA……………………………………………………………45

2.  There is No Evidence CM Knowingly or Intentionally
    Violated the TCPA…………………………………………………………46

3.  Plaintiff has Failed to Prove Actual Damages under the FDCPA………..47

4.  Plaintiff has Failed to Prove His Damages under Texas Law…………...52

IV.   **CONCLUSION**………………………………………………………………………54

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DEREK LEE, | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | Civil Action No. 3:10-cv-00538 |
| | § | |
| CREDIT MANAGEMENT, LP | § | |
| (erroneously named as Credit | § | |
| Management, LP dba The CMI Group), | § | |
| Defendant | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant Credit Management, LP, and files this Motion for Summary Judgment and would respectfully show to the Court as follows:

### I.

### FACTS

1.      Plaintiff's Comcast cable service was disconnected on June 2, 2010. *See* Defendant's Appendix ("Def. App.") at 78; 20 (25:1-6). At that time, Plaintiff's Comcast account had an outstanding balance of $386.21. Def. App. at 70. In order to collect this balance, Comcast employed the services of Credit Management, LP ("CM") and placed Plaintiff's account with CM on July 10, 2010. *See id.*

2.      On July 14th, CM called and spoke with Plaintiff for the first time about his account. *See id.* at 71. During this call, Plaintiff told CM's representative that he had received an email from Comcast stating that he only owed $32.00. *Id.*; Def. App. at 21 (26:3-12). When the representative asked if Plaintiff could send that information to CM, Plaintiff said that he would fax it over. *Id.* at 71. However, he did not.

---

3.      CM next spoke with Plaintiff on August 5, 2010. *Id.* CM's representative again asked Plaintiff if he would send in the information proving he only owed $32.00. *See id.* This time, Plaintiff outright refused to do so. *See id.* It is at this point that Plaintiff alleges he said, "So you're telling me that I have to either pay this debt or provide you paperwork today or you're going to continue to harass me; is that correct?" Def. App. at 27 (52:6-11). To which CM's representative allegedly said, "That is correct." *See id.* This is when Plaintiff said, "Thank you, that's all I needed to hear," and Plaintiff hung up. *See id.*

4.      Plaintiff called CM back on August 5th to speak to a supervisor. Def. App. at 71-72; 25 (42:1-9); 27 (52:12-15). Plaintiff explained that his balance was so high because of unreturned equipment that Comcast had recently picked up, except for a modem. *Id.* at 20 (25:7-21); 29 (60:16-23). As for the modem, which represented the $32.00 balance Plaintiff claimed all was owed, he said that he would either return it or pay for it. *Id.* at 70. While the supervisor was explaining what he could do for Plaintiff, the call was unexpectedly dropped. *Id.* However, the supervisor went ahead and put Plaintiff's account on a two week hold, ceasing all collection activities, to afford Plaintiff time to put his dispute in writing so that CM could verify the amount owed, per the requirements of the Fair Debt Collection Practices Act ("FDCPA"). *Id.*; *see* 15 U.S.C. § 1692g(b).[1]

5.      Shortly after the previous call was dropped, Plaintiff called CM back to conclude the conversation. Def. App. at 73; 26 (47:1-12). In this discussion, Plaintiff again told the CM representative that he would fax over the Comcast email so that CM could verify the amount owed. *Id.* at 73. But once again, Plaintiff did not do so. *Id.* at 29 (60:1-8). No other calls were made to Plaintiff after this conversation. *Id.* at 73; 29 (59:22-25).

---

[1] 15 U.S.C. § 1692f(b) states that "[i]f the consumer notifies the debt collector in writing…that the debt, or any portion thereof, is disputed…the debt collector shall cease collection of the debt…until the debt collector obtains verification of the debt…"

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                                      2

6.      Plaintiff filed his lawsuit on November 18, 2010. *See* <u>Def. App.</u> at 1-16. In his Complaint, Plaintiff makes a number of allegations. First, Plaintiff points to his alleged question, "So you're going to continue harassing me by phone like this when I just told you that I don't owe that debt and to stop calling?," to which CM allegedly answered, "That's right. That's exactly what we're going to do," and alleges that, as a result of this exchange, CM violated sections 1692d(2) and (5) of the FDCPA by using "obscene or profane language or language the natural consequence of which is to abuse the hearer" and by "[c]ausing a telephone to ring or engaging a person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id.* at 4; *see* 15 U.S.C. § 1692d(2) & (5).

7.      Second, Plaintiff claims that CM "stated varying amounts of the alleged balance owed between $400.00 and $300.00" violating § 1692e(2)(A) of the FDCPA by falsely representing "the character, amount, or legal status of any debt" and § 1692e(10) by using a "false representation or deceptive means to collect or attempt to collect any debt." <u>Def. App.</u> at 4-5; *see* 15 U.S.C. § 1692e(2)(A) & 1692e(10). Similarly, Plaintiff claims CM violated § 392.304(a)(19) of the Texas Debt Collection Act ("TDCA") which prohibits a debt collector from using any false representation or deceptive means to collect a debt. <u>Def. App.</u> at 6; *see* Tex. Fin. Code § 392.304(a)(19). Fourth, Plaintiff claims that CM failed to provide Plaintiff with any written notice containing Plaintiff's right to dispute the debt and request verification as required by § 1692g(a) of the FDCPA. <u>Def. App.</u> at 5.

8.      Plaintiff moves on to his fifth cause of action by claiming that between July 2010 through September 2010, CM "placed numerous non-emergency telephone calls using an automatic telephone dialing system to Plaintiff's cell phone, without Plaintiff's prior express consent, for which Plaintiff was charged for the call" allegedly in violation of the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii). <u>Def. App.</u> at 5. Finally, Plaintiff alleges that CM, maliciously and in willful, wanton and reckless disregard for the rights of the Plaintiff, made numerous material misrepresentations in its attempt to collect Plaintiff's debt and that such conduct constitutes a violation of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.41 *et seq*. *Id.* at 8.

9.      Under each the alleged causes of action, Plaintiff seeks to recover actual damages as the result of CM's supposed "highly offensive" conduct which allegedly caused "emotional and/or mental anguish damages." <u>Def. App.</u> at 5 & 9. Plaintiff also seeks statutory damages under each statute as well as exemplary or punitive damages under the DTPA which trebles economic damages if CM's conduct was committed knowingly and trebles economic and mental anguish damages if found to be done intentionally. *Id.* at 5-10. Finally, Plaintiff seeks to recover his attorney's fees and costs. *Id.*

## II.

## <u>SUMMARY JUDGMENT STANDARD</u>

10.     The purpose of summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). Additionally, a motion for summary judgment serves to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553 (1986). A finding for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Celotex*, 477 U.S. at 372. When a defendant moves for summary judgment, it may either (a)

submit summary judgment evidence negating the existence of a material element of the plaintiff's claim, or (b) show there is no evidence to support an essential element of the plaintiff's claim. *Celotex*, 477 U.S. at 322-25. Thus, the movant may identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). This can be done by pointing out "the absence of evidence supporting the nonmoving party's case." *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995).

11.     If the movant meets this initial burden, the non-movant then must introduce evidence establishing that there is a genuine issue of material fact. *Matsushita*, 475 U.S. at 585-86. In making the decision whether a fact issue exists, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

### III.

### ARGUMENT AND AUTHORITIES

**A.     Plaintiff's Claim Under the Telephone Consumer Protection Act.**

12.     Plaintiff's alleged cause of action under the TCPA states the following:

> It shall be unlawful…to make any call (other than a call…made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

*See* 47 U.S.C. § 227(b)(1)(A)(iii).

1.     The TCPA Does Not Apply to Debt Collection Activities.

13.     On December 20, 1991, Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices Congress found to be an

invasion of consumer privacy and even a risk to public safety. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Second Order on Reconsideration, 20 FCC Rcd 3788, ¶ 3 (2005) (2005 TCPA Order). The statute restricts the use of automatic telephone dialing systems ("ATDS"), of artificial or prerecorded voice messages, and of telephone facsimile machines to send unsolicited advertisements. 2005 TCPA Order at ¶ 3; *see* 47 U.S.C. § 227(b)(1). While recognizing the legitimacy of the telemarketing industry, Congress passed the TCPA to balance the industry's commercial freedoms against individuals' privacy rights and public safety.[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, ¶ 2-3 (1992) (1992 TCPA Order). Based on Congress' discussion, it is apparent that the purpose of the TCPA is to protect the public from telemarketing and unsolicited advertisements and should not be applied to debt collection efforts.

14.     As noted by the Fifth Circuit, statutes are not intended to be parsed to address industries not contemplated by Congress.  "In determining the legislative intent, we follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context…  Words are not pebbles in alien juxtaposition, they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used.  In construing the statute court should adopt that sense of words which best harmonizes with context and promotes policy and objectives of legislature.  If the language alone is not dispositive, we must delve into the history and purpose of the statute."  *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d, 507 511 (5th Cir. 1997)

---

[2] The preamble of the TCPA noted that the use of telemarketing was widespread, and generated more than $400 billion in commercial activity each year, through more than 30,000 businesses employing more than 300,000 people. 1992 TCPA Order at ¶ 3.

15.    The Fifth Circuit has delved into the TCPA and has clearly recognized the sole purpose of the Act.  "The history and purpose of this statute provide further support for the conclusion that Congress intended to confer exclusive jurisdiction upon the state courts.  Congress enacted the TCPA as a supplement to state efforts to regulate telemarketing activities.    This nonconsensual telemarketing activity was viewed by Congress as an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services….  By creating a private right of action in state courts, Congress allowed states in effect to enforce regulation of interstate telemarketing activity."  *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d. 507, 513 (5th Cir. 1997).  Only creative Plaintiffs have extended the statute to beyond the telemarketing arena.  This Court should put it back in its place.  Therefore, Plaintiffs' claims under this statute should be dismissed at summary judgment.

2.    <u>Plaintiff Has Not Properly Pled a Cause of Action Under the TCPA.</u>

16.    Federal courts have only the power authorized them by Congress pursuant to Article III of the Constitution. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). "Inferior federal courts' 'federal question' jurisdiction ultimately depends on Congress's intent as manifested by the federal statute creating the cause of action." *Sheldon v. Sill*, 49 U.S. 441, 448 (1850). The TCPA, the federal statute creating Plaintiff's alleged cause of action, "presents an unusual constellation of statutory features." *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 512 (5th Cir. 1997). The Fifth Circuit Court explained that "[a]fter reviewing the TCPA's text, purpose, and history, we conclude Congress intended the state courts to have exclusive jurisdiction over private actions filed under the TCPA." *Id.* at 514. However, nothing in the TCPA expressly divests federal courts of diversity jurisdiction, *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 338 (2d Cir. 2006), or

supplemental jurisdiction. *Watson v. NCO Group, Inc.*, 462 F. Supp. 2d 641, 646 (E.D. Pa. 2006).

17.    In Texas, the Supreme Court decided that "the TCPA alone does not create an immediately enforceable right." *Chair King v. GTE Mobilnet of Houston,* 184 S.W.3d 707, 716 (Tex. 2006).  Instead, the statute "suggests the necessity of affirmative state action to activate the TCPA's private cause of action." *Id.* This affirmative action appears in the Texas Business & Commerce Code § 305.053 which enables the TCPA cause of action in state.

18.    "[T]he party who brings a suit is master to decide what law he will rely upon." *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 22 (1983) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)). In the case at bar, the TCPA does not create a private right of action in federal court. Thus, pleading it as such is futile. Instead, Plaintiff must plead Texas's enabling statute – Tex. Bus. & Com. Code § 305.053 – as a cause of action over which the Court may exercise supplemental jurisdiction. Because Plaintiff has failed to plead this state-law cause of action and because he has not alleged that this Court has supplemental jurisdiction over such a state-law cause of action, his claim under the TCPA must be dismissed at summary judgment. *See* <u>Def. App.</u> at 2-8.

       3.   <u>The TCPA Must Be Applied According to Texas Law.</u>

19.    Plaintiff's claim under the TCPA is initially derived from Section 227(b)(3) which states the following:

> **Private Right of Action**. A person or entity may, *if otherwise permitted by the laws or rules of court of a State*, bring in an appropriate Court of that State –
>
> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violations,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

47 U.S.C. § 227(b)(3) [emphasis added]. As a result of this language, the Fifth Circuit determined that, when Congress passed the TCPA in 1991, it granted a private cause of action exclusively in state court "if otherwise permitted by the laws or rules of court of a State." 47 U.S.C. § 227(b)(3); *see Chair King*, 131 F.3d at 513-14. Although this statute created an enforceable right, "Texas did not otherwise permit a cause of action" under the TCPA until Texas enabled it by statute." *Chair King*, 184 S.W.3d at 717-18.

20.    "The principal motivation behind the TCPA," the Texas Supreme Court opined, "strongly suggests that its remedies were meant to enhance the states' existing attempts to regulate unsolicited calls and faxes…not to create an independent regulatory framework for a potential flood of individual state-court lawsuits." *Chair King*, 184 S.W.3d at 716. "Congress intended significant deference to states" in determining whether to entertain TCPA claims because it is an "area of uniquely state concern." *Id.* at 717 (quoting *Int'l Sci. & Tech. Ins., Inc. v. Inacom Commc'ns, Inc.,* 106 F.3d 1146, 1156 fn. 8 (4th Cir. 1997). The Court reached this conclusion by noting that section 227(e)(1) of the TCPA is titled "**State law not preempted**." *Chair King*, 184 S.W.3d at 718 [emphasis added]. The Supreme Court decided that "Congress clearly did not intend the TCPA to establish a ceiling if states decided to be more aggressive in their approach, ***but it does not necessarily follow that Congress intended the TCPA to be a mandatory floor for private enforcement whether or not a state chose to allow it***." *Id.* at 718 [emphasis added].[3] In

---

[3] *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("In all preemption cases, and particularly in those [where] Congress has 'legislated…in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") [internal citations omitted].

support of this conclusion, the Court cited the U.S. Supreme Court's opinion in *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 780, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947), which held that "[a]ny indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States." *Chair King,* 184 S.W.3d at 718.

21.      According to the reasoning of the Texas Supreme Court, the TCPA is a federal statute which States can choose whether to enforce, and if they do so, they may establish more or less restrictive provisions. Essentially, the TCPA's primary purpose is to allow states to apply their own telemarketing laws, however restrictive, on interstate communications in state court. 184 S.W.3d at 716 ("There is strong evidence that Congress wanted to assist state regulation in reaching interstate communications if a state so desired…"). The purpose was not to establish a uniform federal law because the statute explicitly does not preempt state laws covering the same subject matter and States may or may not choose to "opt-in" to the statute. Thus, Congress opened the dam to state courts for litigation over interstate communications, but the states still control the volume of the flow.

22.      Because "the TCPA alone d[id] not create an immediately enforceable right," but had to be activated by a state's legislature, Texas decided to "opt-in" by amending the Business and Commerce Code with what is now Tex. Bus. & Com. Code § 305.053; enabling plaintiffs to bring TCPA claims in Texas. *Chair King,* 184 S.W.3d at 716. Just as the Fifth Amendment can only be applied to the states through the Fourteenth Amendment, so may the TCPA only be applied in Texas through this provision. According to the Texas Supreme Court's rationale, § 305.053 is the lens through which the court must look when enforcing the TCPA. A Texan who wishes to invoke the protections offered by the TCPA, may do so by pleading § 305.053 of the

Business and Commerce Code and is, therefore, limited to the "opt in" language employed by that statute. And "because Congress rested jurisdiction for private causes of action under the TCPA with the states, federal courts hearing TCPA claims…should apply the same substantive law that the state court would apply." *Holster v. Gatco, Inc.*, 485 F. Supp. 2d 179, 184 (E.D.N.Y. 2007); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 549 F.3d 137 (2nd Cir. 2008).[4]

>           4.    Texas Law Only Applies the TCPA to Calls "Received."

23.    Section 305.053 of the Texas Business and Commerce Code states the following:

> A person who ***receives*** a communication that violates 47 U.S.C. § 227, a regulation adopted under that provision, or Subchapter A may bring an action in this state against the person who originates the communication for an injunction, damages in the amount provided by this section, or both an injunction and damages.

Tex. Bus. & Com. Code § 305.053. Based on the legislature's clear and unambiguous language, Texas has decided to narrow the focus of its TCPA lens to only those calls that are received, rather than all calls made. The fact that the legislature used this phrase "[a] person who ***receives*** a communication that violates 47 U.S.C. § 227" rather than simply stating, "[a] communication that violates 47 U.S.C. § 227," cannot simply be ignored. Where a statute is clear and unambiguous, a court may determine Congressional intent from the plain and ordinary meaning of the words used within the statute. *United States v. Locke*, 471 U.S. 84, 95, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985).[5] Therefore, this Court must determine that, when the Texas Legislature used

---

[4] "To permit this action to proceed in federal court, without applying the substantive law of the state, would, in essence, ignore the role of New York as the forum state and it would divest New York of the ability to decide in what situations a cause of action exists under the TCPA…" *Holster*, 485 F.Supp.2d at 184.

[5] "[D]eference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *United States v. Locke*, 471 U.S. at 95.

the word "receives" in opting-in to the TCPA, it intended for that word to be given its plain and ordinary meaning in modifying the State's utilization of the statute.

24.      This principle is illustrated in the very first sentence of *The Chair King v. GTE Mobilnet of Houston* where the Texas Supreme Court stated that "[t]he suit underlying this appeal complains of unsolicited faxes *sent* in violation of the [TCPA], which grants those who *receive* illegal faxes a private cause of action in state court 'if otherwise permitted by the laws or rules of court of a State.'" 184 S.W.3d at 708 [emphasis added]. This sentence indicates that while the TCPA prohibits a person from sending unsolicited faxes, the private right of action is limited only to those who receive these illegal faxes. This conforms to the Court's conclusion that "Texas did not otherwise permit a cause of action for the *receipt* of unsolicited fax advertisements until September 1, 1999..." when it adopted its enabling statute. *See id.* at 718 [emphasis added].

25.      In *Texas v. American Blastfax, Inc.*, the District Court for the Western District of Texas found that the defendants attempted to send an average of five (5) fax ads per month to approximately 500,000 people in their database, equaling 2.5 million faxes per month. 164 F.Supp.2d 892, 895 (W.D. Tex. 2001). The court also found that "[n]ot every fax sent reached its intended recipient" and that testimony supported a finding that only "75% of these faxes actually were received." *Id.* at 900 & n. 2. Based on this finding, the court determined that the State could not recover for transmissions that were never received and reduced the damages award accordingly, finding a total of 937,500 TCPA violations per month (2.5 million multiplied by 50% [amount of faxes sent without consent or business relationship] and then by 75%). *See id.* at 900.

26.     In *Intercontinental Hotels Corp. v. Girards*, 217 S.W.3d 736 (Tex. App.—Dallas 2007, no pet.), another fax case, the court found that the record showed that "while [the plaintiffs] are apparently able to identify numbers to which Blastfax sent faxes and billing numbers associated with those numbers, the records do not go back to 2000 to show the relationship between billing numbers and working telephone numbers in 2000." *Id.* Thus, "the recipients of Intercontinental's faxes in 2000 are not presently ascertainable." *Id.* As a result, the court reversed the class certification because while the plaintiffs were able to identify the numbers to which Blastfax sent faxes, they were unable to identify who actually received any of the faxes.[6] *See id.*

27.     In *First National Collection Bureau, Inc. v. Walker*, the Dallas Court of Appeals rejected the "received" argument. No. 05-10-00129-CV (Tex. App.—Dallas July 14, 2011). However, its rejection ignores key points from the Texas Supreme Court's *Chair King* opinion and its own precedent. The Dallas Court argued that the *Chair King* opinion did not address whether a state could enact laws less restrictive than the TCPA, i.e. finding liability for only calls "received" rather than "made." (which is inherently less restrictive because, in cases like this, more calls are made than received). Further, the Court argued that the Supremacy Clause and the language of the TCPA do not permit the "receives" interpretation because while 47 U.S.C. § 227(e)(1)[7]

---

[6] *See Pinnacle Realty Management Co. v. Kondos*, 130 S.W.3d 292 (Tex. App.-Dallas 2004, no pet.) (trial court certified class as "holders of telephone numbers on the date they are confirmed to have received…fax ads;" decertified because defendant's telephone logs only contained telephone numbers, not names, so class members were not presently ascertainable); *Apartment Inv. and Management Co. v. Suggs & Assocs. P.C.*, 129 S.W.3d 250 (Tex. App.—Dallas 2004, no pet.) (similar to *Pinnacle*, the court found, in part, that because the rate at which telephone numbers are disconnected, taken out of service and replaced, the present holder of the fax number may not be the recipient of the illegal fax. Thus, the class could not be certified in sole reliance on the defendant's fax logs).

[7] STATE LAW NOT PREEMPTED.—Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits –

    (A) The use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

    (B) The use of automatic telephone dialing systems;

    (C) The use of artificial or prerecorded voice messages; or

    (D) The making of telephone solicitations.

47 U.S.C. § 227(e)(1).

specifically does not preempt "more restrictive" laws, the converse must be true – that less restrictive or narrower, less onerous restrictions are preempted. (The Court relied on the statutory interpretation tool of *expressio unius est exclusio alterius*, inclusion of specific limitations implies exclusions of all others). Thus, the Court assumed that the "received" language of the Tex. Bus. & Com. Code was preempted by the TCPA. However, the Texas Supreme Court did address these specific issues.

28.    In *Chair King*, the Court considered three possible interpretations of the TCPA ("Acknowledgement" approach, "Opt Out" approach, "Opt In" approach) and ultimately concluded that Texas had to "opt in" or enable the TCPA by affirmative state action. The plaintiffs, like the *Walker* Court, argued that the negative implication of (e)(1) suggested that less restrictive penalties are indeed preempted. 184 S.W.3d at 717. Thus, the plaintiffs argued that the "opt in" approach would render subsection (e)(1) meaningless because it could not preempt less restrictive state laws until a state acted. *Id.* But the Supreme Court countered with the fact that the "opt out" approach would similarly render (e)(1) meaningless once a state opted-out of the TCPA. The Court held that "[o]nly an 'acknowledgement' interpretation, which we have rejected, would give full effect to subsection (e) *if in fact it were intended to preempt less restrictive state penalties*." *Id.* at 717-18 [emphasis added].

29.    The Court further explained:

> First, we note that section 227(e)(1) is specifically titled "State law not preempted." Furthermore, Congress's intent to supplement state legislation explains why the preemption concern would have focused on more aggressive regulation by the states. *See Chair King* [*v. Houston Cellular Corp., 131 F.3d 507, 513 (5th Cir. 1997)*] ("By creating a private right of action in state courts, Congress allowed states, in effect, to enforce regulation of interstate telemarketing activity."). Congress clearly did not intend the TCPA to establish a ceiling if states decided to be more aggressive in their approach, but it does not necessarily follow that Congress intended the TCPA to be a mandatory floor for private enforcement whether or not a state chose to allow it.

*Chair King*, 184 S.W.3d at 718. Following this quote, the Court cited to two U.S. Supreme Court opinions that are very revealing. *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) ("In all preemption cases, and particularly in those [where] Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"); *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767, 780 (1947) ("Any indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States.").

30.     This discussion reveals that the Texas Supreme Court considered the regulation of this type of activity to be one states have traditionally occupied and involving the states' police power. Thus, if Congress wanted the TCPA to preempt less restrictive measures, it should have done so with "drastic clarity," rather than referring to a statutory interpretation tool as the Dallas Court did in *Walker*. Further, the Texas Court specifically held that it did not follow from the preemption language that Congress intended the TCPA to be a "mandatory floor" for the states' enforcement. Indeed, only the acknowledgement approach, which the Court rejected, would satisfy the *Walker* court's opinion that the TCPA preempted lesser restrictions. Therefore, the *Walker* opinion ignores the Texas Supreme Court and the clear language of the *Chair King* opinion.

31.     The *Walker* court also dismisses its own prior opinion in *Intercontinental Hotels Corp. v. Girards* by saying that "[w]hile this Court used the word "recipients" in its analysis, the issue in *Intercontinental Hotels Corp.* was whether the members of the class were subject to identification." Because the "receipt" issue was not addressed, the Court did not find the case

instructive. Essentially, the *Walker* court is now arguing that because there were no "names" connected with fax numbers in *Intercontinental Hotels*, the class was unidentifiable rather than the fact that there was no way to tell who received the fax. This means that if there are names connected to the fax numbers, the Dallas Court of Appeals will grant a TCPA cause of action to plaintiffs based entirely on a defendant's record of faxes sent, regardless of whether that plaintiff received the fax, regardless of whether the fax machine was plugged in, and regardless of whether the plaintiff even had a fax machine that could have received a violative fax. This interpretation would inevitably lead to absurd results like that Judge Sparks refused to reach in *Texas v. American Blastfax* of awarding $2.34 billion in damages when the illegal faxes only cost approximately $328,000 in actual damages. Based on *Chair King*, state law controls the TCPA's application and Texas limits its cause of action to calls actually "received."

32.     In the present case, Plaintiff alleged in his complaint that CM "placed numerous non-emergency telephone calls…to Plaintiff's cell phone" in violation of the TCPA. *See* <u>Def. App.</u> at 5. At his deposition, Plaintiff claimed that he received eight (8) to ten (10) calls from CM, all of which he answered and had conversations with CM representatives. *See id.* at 21 (27:24-28:7); 24 (38:22-39:3); 31 (67:9-19). However, Plaintiff also admitted that he has bills from his telephone service provider, T-Mobile, allegedly showing both incoming and outgoing calls, but he has failed to produce them. *See id.* at 21 (28:8-22); 40& 43 (Nos. 3, 13). Furthermore, while Plaintiff was able to specifically recall his first conversation with CM that took place on July14th and the last that took place on August 5th of 2010, Plaintiff only generally testified that in the second conversation, which allegedly occurred one day after the first, CM's representative again told him to send in proof that he did not owe the alleged amount and that the remaining five (5) to seven (7) conversations were substantially the same. *See id.* at 22-23 (33:3-34:9); 24 (40:4-

14); 25-26 (45:4-46:23). In fact, Plaintiff gave no specific testimony regarding the conversations allegedly had in these remaining calls; instead, he again relies on his telephone bills, which he has not produced, as evidence that these conversations took place. *Id.*

33.     To the contrary, CM has produced its own account notes demonstrating that it only ever spoke to Plaintiff on the two (2) occasions Plaintiff specifically remembers; the conversations occurring on July 14th and August 5th. *See* <u>Def. App.</u> at 71-73. CM had its first conversation with Plaintiff on July 14th in which Plaintiff told CM that he only owed $32.00 and that he would send proof of this debt to CM. *Id.* at 71. CM next spoke with Plaintiff on August 5th; Plaintiff again stated that he only owed $32.00, but refused to send in any proof and hung up. *Id.* Plaintiff called CM back to speak with a supervisor whom he again told that he only owed $32.00 due to an unreturned modem. *Id.* at 72. Plaintiff again called CM after the previous call was unexpectedly dropped and, this time, Plaintiff recanted his initial refusal and promised to fax in his proof of the amount owed. *Id.* at 73. CM's record of calls shows that no other conversations took place between CM and Plaintiff. Thus, if Plaintiff is even able to prove a violation of the TCPA, he is limited to these two telephone calls which he actually received.

        5.     <u>Plaintiff Consented to the Calls from CM.</u>

34.     Plaintiff alleges that CM violated § 227(b)(1)(A)(iii) of the TCPA. This provision prohibits any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] or an artificial or prerecorded voice" to a cellular telephone for which the called party is charged. *See* 47 U.S.C. § 227(b)(1)(A)(iii). In the Fifth Circuit, whether consent is an element of a TCPA claim or an affirmative defense is an open question. *See Gene & Gene, L.L.C. v. Biopay, L.L.C.*, 541 F.3d 318, 327 (5th Cir. 2008).

35.     The District Court for the Northern District of Texas explained that when a defendant has provided enough evidence for a prima facie showing of consent and the plaintiff has not shown competent evidence against a finding of consent (and thereby did not establish a genuine issue of material fact), summary judgment in favor of consent was permissible. *See Cunningham v. Credit Management, L.P.*, No. 3:09-cv-1497-G (BF) (N.D. Tex. Aug. 30, 2010). The Court also recognized the Federal Communication Commission's statement that "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 564 (2007). Furthermore, calls "placed by a third party collector on behalf of [the] creditor are treated as if the creditor itself placed the call." *Id.* at 565.

36.     In *Cunningham*, the evidence presented showed that the plaintiff had an account with the creditor, Time Warner, for internet services. The evidence also showed that the plaintiff did not have a residential line or landline phone, and the plaintiff refused to disclaim that he provided his cell phone number in connection with the account. Based on this circumstantial evidence, the Court found that the defendant sufficiently established that plaintiff provided his number in connection with his account and thereby consented to calls he may receive relating to it.

37.     At his deposition in the present case, Plaintiff admitted that he had an account with Comcast for cable/internet services and that he canceled this service. Def. App. at 34 (78:5-7). Plaintiff also explained that as a "tankerman," he works "offshore" for fourteen (14) or more days in a row and returns for seven (7) days, making a cell phone the optimal mode of communication. *Id.* at 18 (6:19-24); 20 (23:17-24:16). Plaintiff also could not recall whether he

provided his cell phone number to Comcast when he contracted for their services. *Id.* at 23 (35:14-16).

38.     Additionally, when asked whether he had any objection to CM calling him on his cell phone; Plaintiff answered in the affirmative. *See* <u>Def. App.</u> at 23 (36:16-37:12). But when asked what his objection was, Plaintiff responded, "The harassment that came from it." *See id.* To clarify his response, Plaintiff was asked, "Is your [] complaint about calling on the cell phone or just the content of the conversation?" *Id.* Plaintiff answered, "The content of the conversation." *See id.* Finally, Plaintiff was a third time asked, "So your objection is not that they called you on the cell phone, it's what occurred in the conversation – is that fair?," to which Plaintiff said, "Yes." *Id.*

39.     As explained above, the relevant TCPA provision prohibits calls to a cell phone, except for emergency calls, regardless of their content. But as seen in his testimony, Plaintiff does not object to having been called on his cell phone. Instead, Plaintiff only objects to the content of those alleged calls. Based on this testimony, Plaintiff has rejected his own claim under the TCPA. Furthermore, similar to *Cunningham*, the circumstantial evidence shows that Plaintiff had an account with Comcast, Plaintiff primarily relies on his cell phone for communication due to the fact that he works offshore more than he is at home, and he cannot specifically disclaim that he provided his cell phone number to Comcast. Because Plaintiff only particularly complains of the content of the calls, rather than their destination, and the evidence creates a prima facie showing of consent and because Plaintiff has not established a genuine issue of fact, CM asks for a finding that Plaintiff consented to calls from Comcast and, thereby, to calls from CM.

      6.     <u>Debt Collection Calls Do Not Satisfy the TCPA's Definition of "Automatic Telephone Dialing System."</u>

40.     The TCPA defines an automatic telephone dialing system ("ATDS") as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1). The Federal Communications Commission ("FCC"), "the agency entrusted with the development of rules for the interpretation of the TCPA," has addressed the issue of whether debt collection calls satisfy this ATDS requirement. *Charvat v. Dispatch Consumer Serv., Inc.*, 769 N.E.2d 829, 833 (Ohio 2002). But before deciding whether the statute's definition is sufficiently ambiguous to warrant a clarifying agency regulation,[8] it is important to note that the FCC's conclusion has changed over time.

41.     In 1992, the FCC concluded that debt collection calls were not autodialer calls or calls "dialed using a random or sequential number generator." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, ¶ 39 (1992) (1992 TCPA Order). Three years later, the FCC reaffirmed this conclusion in a memorandum opinion and order, stating that "debt collection calls are not directed to randomly- or sequentially-generated telephone numbers, but instead are directed to the specifically programmed contact numbers for debtors." *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90,

---

[8] "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A court must give "[s]uch legislative regulations…controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843 -44. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9.

Memorandum Opinion and Order, 10 FCC Rcd 12391, ¶ 19 (1995) (1995 TCPA Reconsideration Order).

42.    In 2003, the FCC changed its position regarding debt collection calls. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003) (2003 TCPA Order). This shift occurred while considering whether a "predictive dialer" was an ATDS under the TCPA. 2003 TCPA Order at ¶ 129-133. The Commission acknowledged that a predictive dialer is equipment that dials numbers and, when paired with certain computer software, assists telemarketers in predicting when a sales agent will be available to take calls. *Id.* at ¶ 131. However, the FCC combined the two separate sections of the TCPA's definition of ATDS to incorrectly conclude that because a predictive dialer "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," it is an ATDS. *Id.* This conclusion improperly transferred the "random or sequential" clause from the section prohibiting how numbers are *generated* to how the calls are *dialed. See* 47 U.S.C. § 227(a)(1)(A) & (B) ("…using a random or sequential number generator…").

43.    This flawed reasoning lead the FCC to conclude that it was irrelevant whether the dialing equipment created and dialed an arbitrary 10-digit telephone number or that it used a preprogrammed list of numbers. 2003 TCPA Order at ¶ 132. In addition, the Commission stated that, based on the definition, the equipment need only have the *capacity* to store or produce telephone numbers. *Id.* The FCC ultimately distorted the purpose and definition of the ATDS provision by concluding that violative equipment is that which simply has "the capacity to dial numbers without human intervention," ignoring that the definition only prohibits the dialing of randomly- or sequentially-generated numbers. *Id.*

44.     The FCC attempted to bolster its conclusion by claiming that excluding a dialer "simply because it relies on a given set of numbers would lead to an unintended result." *Id.* at ¶ 133. "Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages." *Id.* The Commission believed that the purpose of the phrase "capacity to store or produce telephone numbers" was meant to prevent this result of permitting calls made to preprogrammed numbers. *Id.* Unfortunately, this is not the case.

45.     Congress's definition of ATDS specifically separates the origin of the telephone numbers and the dialing of the numbers into two sections. *See* 47 U.S.C. § 227(a)(1)(A) & (B). The first section states that an ATDS is "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). A simple inspection of this section reveals that the phrase "using a random or sequential number generator" modifies the previous phrase, explaining the origin of the "store[d] or produce[d]" telephone numbers. "Generate," from which the word "generator" is derived, means "to bring into existence" or "to be the cause of." *See* "Generate," Merriam-Webster Online Dictionary (2010), http://www.merriam-webster.com/dictionary/generates. This means that the telephone numbers that an ATDS has the capacity to store or produce are those brought into existence, caused, or created randomly or sequentially by the ATDS. This does not include a list a telephone numbers derived from debtors' account notes.

46.     If the FCC's opinion was correct, virtually every modern-day communication device would constitute an ATDS because computers, cellular phones, and digital landline telephones all have the capacity to store telephone numbers. A person would have to resort to using a rotary

telephone in order to avoid the FCC's definition of an autodialer.[9] Thus, a cell phone call from a private citizen to another could violate § 227(b)(1)(A) of the TCPA unless there was prior express consent. Certainly this is the "unintended result" the FCC should fear.

47.     Congress made its intent clear in the language that it used in defining what constituted an ATDS. It prohibited randomly- or sequentially-generating telephone numbers presumably because calling arbitrarily-dialed numbers is more likely to result in calls to emergency facilities, hospital rooms, and wireless telephones than calls made to a predetermined, preprogrammed list of customers, consumers, or debtors. The TCPA's prohibition does not apply to randomly-dialed calls from a list of numbers, but to randomly-generated numbers. Thus, calling a predetermined list of debtors cannot fulfill the ATDS requirement under § 227(b)(1)(A). By not prohibiting calls to a preset list of telephone numbers, the TCPA does not apply to these types of debt collection calls.

48.     In the present case, there is no evidence that CM used an ATDS as it is defined by the TCPA. Plaintiff has presented no evidence that CM used equipment which randomly- or sequentially-generated his cell phone number rather than obtaining his number from the creditor. In fact, this is exactly where CM obtained Plaintiff's telephone number – from Comcast. <u>Def. App.</u> at 68 (affidavit). Without any controverting evidence, Plaintiff cannot satisfy this requirement under his TCPA cause of action. As a result, his TCPA claim should be dismissed.

          7.     <u>Plaintiff Admits CM Did Not Use an Artificial or Prerecorded Voice</u>.

---

[9] The rotary dial is a device mounted on or in a telephone or switchboard that is designed to send interrupted electrical pulses, known as pulse dialing, corresponding to the number dialed. To dial a number, the user puts a finger in the corresponding finger hole and rotates the dial clockwise until it reaches the finger stop. The user then pulls out their finger, and a spring in the dial returns it to the restarting position causing electrical contacts to open and close the appropriate number of times, sending that number of pulses to the central office. *See* "Rotary Dial," Wikipedia (2010), http://en.wikipedia.org/wiki/Rotary_dial.

49.     Based on Plaintiff's cause of action, the only remaining type of debt collection call that could possibly violate the TCPA is one that uses an artificial or prerecorded voice and is made to one of the prohibited destinations under § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(1)(A)(iii). However, at Plaintiff's deposition, he explained that he answered every call allegedly made from CM and that they were all live calls. *See* Def. App. at 24 (38:22-39:13); 25 (42:20-44:2); 31 (67:9-19). In fact, Plaintiff specifically stated that he never heard any "computerized" voices and he does not believe he received any voicemails. *See id.* As a result of his own testimony, Plaintiff is unable to make a claim under § 227(b)(1)(A)(iii) of the TCPA. There is no evidence that CM used an ATDS by randomly- or sequentially-generating Plaintiff's cell phone number or that CM used an artificial or prerecorded voice in any call. Consequently, Plaintiff's claim under the TCPA should be dismissed at summary judgment.

        8.      Plaintiff Was Not "Charged" for CM's Calls as Required by the TCPA.

50.     The TCPA, under 47 U.S.C. § 227(b), states that "[i]t shall be prohibited for any person...to make any call...using any automatic telephone dialing system or an artificial or prerecorded voice - to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or *any service for which the called party is charged for the call*." 47 U.S.C. § 227(b)(1)(A)(iii) [emphasis added]. In 1992, just after the law's passage, the FCC said that "[b]ased on the plain language of § 227(b)(1)(iii), we conclude that the TCPA did not intend to prohibit autodialer or prerecorded message calls to cellular customers for which the called party is not charged." 1992 TCPA Order ¶ 45.

51.     Just over a decade later, the FCC issued another report regarding wireless calls. While considering the National Do-Not-Call registry established by the Federal Trade Commission

("FTC"), the FCC explained that the "FTC clarified that because wireless subscribers are often charged for the calls they receive, they will be allowed to register their wireless telephone numbers on the...database." 2003 TCPA Order ¶ 23. The FCC concluded that "Congress has indicated its intent to provide significant protections under the TCPA to wireless users" and that "[a]llowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations *for which they are charged*." *Id.* at ¶ 33 [emphasis added]. Later in its order, the FCC stated that "[t]he TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing…telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call." *Id.* at ¶ 133. This was because such practices "inappropriately shift[ed] marketing costs from sellers to consumers." *Id.*

52.     In approving the TCPA, Congress was evidently concerned with the shifting of costs from advertisers to consumers, and thus imposed the Act as a remedy. This purpose is evidenced by subsequent TCPA litigation. *See Stefano & Assoc., Inc. v. Global Lending Group, Inc.*, 2008-Ohio-177 (9th Dist. Ct. of Appeals of Ohio 2008); *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649 (8th Cir. 2003). In *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, one of the defendants complained that the differential treatment between unsolicited faxes and live telemarketing calls created a gap in the TCPA's coverage which limited the statute's effectiveness, rendering the TCPA unconstitutional. *See* 323 F.3d at 656. This gap was created by the fact that unsolicited live telemarketing calls are not restricted by the TCPA, but unsolicited fax advertisements are prohibited. *See id.* at 656-57. However, the court disagreed with the defendant, explaining that the "differential treatment…is consistent with the TCPA's goal to protect members of the public from bearing costs of unwanted advertising." *Id.* at 657.

53.     The "TCPA treats live telemarketing solicitations differently if they impose costs on the recipient." *Id.* "While they are generally permitted…, they are prohibited when they result in out of pocket costs for the recipient." *Id.* (citing 47 U.S.C. § 227(b)(1)(A)(iii)). "Because of the cost shifting of fax advertising, it was consistent for Congress to treat unsolicited fax advertisements differently than live telemarketing calls. The distinction in no way undercuts the TCPA goal of protecting the public from unwanted advertising costs." *Id.*

54.     Although the text of the opinion leaves a gap when it is applied to the present case, the court's logic does not. The court began with the correct premise - that Congress's goal for the TCPA is to protect members of the public from bearing the costs of unwanted advertising. From this, the court naturally concluded that the TCPA restricts advertising or telemarketing methods that shift the costs to consumers. The obvious and correct inverse of that premise, however, is that advertising that does not cost the consumer is not restricted. Based on this reasoning, it is apparent that Congress recognized that all unsolicited facsimile advertising costs the recipient in ink and paper. But Congress also recognized that not all telephonic advertising imposes costs on the recipient. *See* 47 U.S.C. § 227(b)(1)(B) (the TCPA does not prohibit calls using an ATDS to residential telephones). Thus, Congress only prohibited telephone calls to "any service for which the called party is charged for the call." *See* 47 U.S.C. § 227(b)(1)(A)(iii). As a result, to prove a claim under 47 U.S.C. § 227(b)(1)(A)(iii), a party must prove it bore unwanted costs or was "charged for the call."

55.     In the present case, Plaintiff alleges that CM "placed numerous non-emergency telephone calls using an automatic telephone dialing system to Plaintiff's cell phone, without Plaintiff's prior express consent, for which Plaintiff was charged for the call" in violation of § 227(b)(1)(A)(iii) of the TCPA. Def. App. at 5. Despite this allegations, at his deposition, when

Plaintiff was asked if he has "been out of pocket any money as a result of these calls?," Plaintiff testified, "I don't believe I have." *See id.* at 36 (91:19-21). Plaintiff offers no evidence that he was ever "charged" for the calls from CM. Furthermore, due to the variety of cellular telephone plans, it cannot be presumed that Plaintiff was, in fact, charged for the calls. Because Plaintiff has failed to present evidence supporting this necessary element of his cause of action, Plaintiff's claim under the TCPA should be dismissed at summary judgment.

**B.    Plaintiff's Claims under the Fair Debt Collection Practices Act.**

       1.    <u>CM Did Not Harass or Abuse Plaintiff in Violation of § 1692d.</u>

56.    Section 1692d of the FDCPA prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." *See* 15 U.S.C. § 1692d. Plaintiff specifically claims that CM violated § 1692d(2) of the FDCPA by using "obscene or profane language or language the natural consequence of which is to abuse the hearer" and § 1692d(5) by "[c]ausing a telephone to ring or engaging a person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." *Id.* at 4; *see* 15 U.S.C. § 1692d(2) & (5).

57.    "Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985). However, courts may resolve the question as a matter of law in appropriate cases. *Jeter*, 760 F.2d at 1179-80; *see Arteaga v. Asset Acceptance, LLC*, No. CV-F-09-1860 LJO GSA, 2010 WL 3310259, at *5 (C.D. Cal. Aug. 23, 2010) ("Although there is no bright-line rule, certain conduct generally is found to either constitute harassment, or raise an issue of fact as to whether the conduct constitutes harassment, while other conduct fails to establish harassment as a matter of law.").

This is because "Congress has indicated its desire for the courts to structure the confines of § 1692d." *Harvey v. Great Seneca Financial Corp.*, 453 F.3d 324, 330 (6th Cir. 2006).

> a.      *Plaintiff Failed to Offer Any Evidence Showing a Violation of § 1692d(2).*

58.      In *Jeter v. Credit Bureau, Inc.*, the Eleventh Circuit stated that § 1692d(2) was "meant to deter offensive language which is at least akin to profanity or obscenity." 760 F.2d at 1178. The Court explained that "[s]uch offensive language might encompass name-calling, racial or ethnic slurs, and other derogatory remarks which are similar in their offensiveness to obscene or profane remarks." *Id.* at 1178; *see* Federal Trade Commission, Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed.Reg. 50097, 50105 (1988) ("Abusive language includes religious slurs, profanity, obscenity, calling the consumer a liar or a deadbeat, and the use of racial or sexual epithets.").

59.      Plaintiff bases his claim under § 1692d(2) on a single conversation he allegedly had with a CM representative on August 5, 2010. <u>Def. App.</u> at 4. Plaintiff explains as follows:

> And she informed me that she was calling, excuse me, in an attempt to collect a debt, and the whole spiel that goes – that had been going with all the other conversations. And I waited for her to finish, and I said, Ma'am, I've already talked to somebody, I've informed them that I work offshore, that when I get back I will fax the information or send the information over. And she said, Well, we don't show any record of that. You need to, you know, take care of this. And I said, That's fine, I will, but I don't owe the money.
>
> And she proceeded to inform me that, you know, they haven't received anything different from Comcast and that I needed to take care of it today by – you – and I said, So you're telling me – and, once again, this is not verbatim, and I said, So you're telling me that I have to either pay this debt or provide you paperwork today or you're going to continue to harass me; is that correct? And she said – and she said, That is correct. And I said, Thank you, that's all I needed to hear. And I hung up the phone.

<u>Def. App.</u> at 27 (51:16-52:11). As can easily be seen, this one simple exchange, even if true, does not amount to a violation of the FDCPA.

60.      Section 1692d(2) specifically prohibits the use of obscene, profane and abusive language. Courts have explained that this includes name-calling, racial and religious slurs or epithets, derogatory remarks, or calling a consumer a liar or deadbeat; none of which occurred here. In fact, according to Plaintiff's testimony, CM's representative simply informed Plaintiff that she was calling to collect a debt, that CM had no record that Plaintiff's balance was what he said it was, that Plaintiff needed to take care of his debt and that CM would continue to contact Plaintiff in order to resolve the issue. Plaintiff presents no evidence that the representative cursed at him, used obscene language, called him any names, used racial, religious or sexual epithets or ever called him a liar or deadbeat. As a result, Plaintiff's claim under § 1692d(2) fails as a matter of law and should be dismissed at summary judgment.

> b.      *Plaintiff's Evidence of the Volume and Pattern of Calls Fails to Raise a Material Issue of Fact under §1692d(5).*

61.      To prove a claim under § 1692d(5), a plaintiff must show that the repeated calls were made *with the intent* to annoy, abuse, or harass. *See Gorman v. Wolpoff & Abramson, LLP*, 435 F. Supp. 2d 1004, 1012 (N.D. Cal. 2006), *rev'd on other grounds*, 584 F.3d 1147 (9th Cir. 2009) [emphasis added]. "In determining liability under § 1692d(5), courts often consider the volume and pattern of calls made to the debtor."[10] *Krapf v. Nationwide Credit, Inc.*, No. SACV 09-00711 JVS (MLGx), 2010 WL 2025323, 2010 U.S. Dist. LEXIS 57849 *6-8 (C.D. Cal. May 21, 2010). However, courts have found that "daily" calls, unaccompanied by other egregious conduct, such as calling immediately after hanging up, calling multiple times in a single day, calling places of employment, family, or friends, calling at odd hours, or calling after being asked to stop, is

---

[10] "Courts have held that '[w]hether there is actionable harassment or annoyance turns not only on the volume of calls made, but also on the pattern of calls.'" *Brandt v. I.C. Sys., Inc.*, No. 8:09-cv-126-T-26MAP, 2010 WL 582051, at *2 (M.D. Fla. Feb. 19, 2010) (quoting *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 505 (D. Md. 2004)).

insufficient to raise a triable issue of fact for the jury. *Waite v. Financial Recovery Services, Inc.*, No. 8:09-cv-02336-T-33AEP (M.D. Fla. Dec. 16, 2010)[11] (citing cases).

62.     For example, "a debt collector does not necessarily engage in harassment by placing one or two unanswered calls in an unsuccessful effort to reach the debtor, if this effort is unaccompanied by any oppressive conduct such as threatening messages." *Saltzman v. I.C. Sys., Inc.*, No. 09-10096, 2009 WL 3190359, at *7 (E.D. Mich. Sept. 30, 2009). Also, "daily" or "nearly daily" phone calls alone fail to raise an issue of fact for a jury to determine whether the conduct violates § 1692d and § 1692d(5). *See Arteaga*, 2010 WL 3310259, at *16. Finally, a Florida court determined that while calling 57 times over a 20-day period appeared "somewhat high," the defendant's conduct still failed to constitute a violation of § 1692d(5) as a matter of law where the defendant left a total of six messages, made no more than seven calls in a single day, did not call back the same day after leaving a message, and did not repeatedly make calls after it was asked to cease. *See Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010); *see Katz v. Capital One*, No. 1:09-cv-1059 (LMB/TRJ), 2010 WL 1039850, at *3 (E.D. Va. Mar. 18, 2010).

63.     Additionally, the Court's review of the facts is not limited to the defendant's conduct. In *Waite v. Financial Recovery Services*, the court, in evaluating whether the defendant harassed the plaintiff under § 1692d(5), noted that the plaintiff never indicated that she ever confirmed or disputed the debt or made any allegation that she asked the defendant to stop contacting her. <u>Def. App.</u> at 60 (n. 8). The plaintiff argued that the court's inquiry into her actions was inappropriate because it placed a burden on her that was not imposed by the FDCPA. *See id.* The court

---

[11] Courtesy Copy attached as <u>Def. App.</u> at 47-67.

partially agreed, stating that "whether a valid debt exists does not matter."[12] *Id.* "However, the Court's interest in this point reflects a desire to clarify the issue of whether Defendant intended to 'annoy, abuse, or harass' in violation of § 1692d(5) or whether Defendant, believing Plaintiff's debt to be valid, merely endeavored to collect that debt, and encountered difficulty in establishing contact with Plaintiff." *Id.* "A high volume of unanswered calls without any prior records of substantive conversations between Plaintiff and Defendant tends to suggest a difficulty in reaching Plaintiff rather than an intent to harass."[13] *Id.*; *see Saltzman*, 2009 WL 3190359, at *67- & n. 4 ("the significant disparity between the number of telephone calls placed by Defendant and the number of actual successful conversations with Plaintiff…suggests a 'difficulty of reaching Plaintiff, rather than an intent to harass.'") (quoting *Millsap v. CCB Credit Servs., Inc.*, No. 07-11915, slip op. at 17 (E.D. Mich. Sept. 30, 2008).

64.     Recently, in *Clingaman v. Certegy Payment Recovery Services*, Judge Atlas considered whether collection phone calls were intended to harass the consumers under § 1692d(5). 2011 WL 2078629, No. H-10-2483 (S.D. Tex. May 26, 2011). After taking the facts and evidence in a light most favorable to the plaintiff, the Court found that fifty-five (55) calls were made to the plaintiff between March 4, 2010 and June 18, 2010, a period of over three (3) months. The Court noted that on most days that the collector did call, it only called once a day, with only two (2) days containing up to four (4) calls. Relying solely on the volume of calls (the plaintiff did not allege an improper pattern), the plaintiff argued that the defendant intended to harass him.

65.     Judge Atlas, to the contrary, reviewed the opinions in *Tucker v. CBE Group, Inc.*, *Carmen v. CBE Group, Inc.*, 2011 WL 1102842, *4 (D. Kan. 2011), and *Saltzman v. I.C. System,*

---

[12] (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ("[T]he FDCPA is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists.").

[13] *See Gorman v. Wolpoff & Abramson, LLP*, 435 F. Supp. 2d 1004, 1012 (N.D. Cal. 2006), *rev'd on other grounds*, 584 F.3d 1147 (9th Cir. 2009) (a plaintiff must show that the repeated calls were made with the intent to annoy, abuse, or harass, as "Congress did not intend the FDCPA to completely bar any debt collection calls.").

*Inc.* to find that the evidence suggested a difficulty in reaching the plaintiff, rather than an intent to harass. Distinguishing the current case from the *Meadows v. Franklin Collection Service, Inc.* case relied upon by the plaintiff, Judge Atlas pointed out that in *Meadows*, the plaintiff did not owe the debts, 300 calls were made over a two and one-half years period, frequently received up to three (3) calls per day, and all was done after the plaintiff informed the collector that the debts were not hers and she asked for the calls to stop. Judge Atlas considered the *Meadows'* facts to be vastly different and not supportive of the plaintiff's claim. As a result, she granted summary judgment in favor of Certegy for the plaintiff's failure to raise a genuine issue of material fact.

66.    In the case before this Court, Plaintiff alleges that CM violated § 1692d(5) by repeatedly contacting Plaintiff during the months beginning July 2010 through September 2010 with the intent to harass. *See* Def. App. at 4. In support of this allegation, Plaintiff testified that he received eight (8) to ten (10) calls from CM, all of which he answered and had conversations with CM representatives. *See id.* at 21 (27:24-28:7); 24 (38:22-39:3); 31 (67:9-19). However, Plaintiff also admitted at his deposition that he did not receive any telephone calls from CM after August 5th, that CM never called him more than once on any given day and that he did not receive any voicemails from CM. *See id.* at 24 (41:18-19);  25 (42:20-43:5); 29 (59:22-25).

67.    In the first conversation Plaintiff recalls, which he admits was probably on July 14, 2010, Plaintiff testified that he was told he had a debt with Comcast for approximately $400. *Id.* at 21 (29:1-30:14); 22 (33:11-22). Plaintiff explained that he had recently received an email from Comcast stating that he no longer owed that amount. *Id.* He then admits that the representative asked him if he could provide this information, but never states whether or not he agreed. *Id.* CM's account notes, on the other hand, show that Plaintiff said he would fax the information to CM. *See* Def. App. at 69. Plaintiff further admitted that the representative was not rude, did not

curse at him and did not threaten to take his personal property or have him put in jail. *Id.* at 22 (30:15-31:19).

68.     In the second alleged conversation, Plaintiff claims that the representative was "a little more aggressive" in telling him that he needed to get the Comcast paperwork showing the reduction in his debt over to CM as quickly as possible. *Id.* at 24 (40:4-14). But again, Plaintiff admits that the representative did not make any threats of physical harm or to take away any personal property. *Id.* (40:19-22). Without remembering any specifics, Plaintiff generally testified that all the conversations he allegedly had, except for the last one, were similar to the first two. *Id.* at 25-26 (45:4-46:19).

69.     Finally, on August 5, 2010, Plaintiff received the last call from CM. *Id.* at 26-27 (49:1-52:12). In this call, the CM representative properly informed Plaintiff that she was calling in an attempt to collect a debt, as did the representatives in all the other calls. *Id.* Plaintiff then stated that he had already talked to someone with CM and explained that he works "offshore" and that he would fax or send the Comcast information when he got back home. *Id.* The representative told Plaintiff that CM had not received anything from Comcast showing the reduction of the debt and then encouraged Plaintiff to take care of the matter today. *Id.* It is at this point that Plaintiff allegedly asked something to the effect of "So you're telling me that I have to either pay this debt or provide you paperwork today or you're going to continue to harass me; is that correct?" *Id.* When the representative allegedly responded, "That is correct," Plaintiff said, "Thank you, that's all I needed to hear" and hung up. *Id.* Despite this alleged exchange, Plaintiff admits that the representative did not call him any names, did not cuss at him and did not threaten to harm, arrest or take away any of his property. *Id.*

70.     It is also important to note that Plaintiff acknowledged that he had done business with Comcast and was also aware of the reason for the debt CM was attempting to collect. *See* <u>Def. App.</u> at 20 (25:1-21); 29 (60:16-25); 34 (78:5-16). Plaintiff admits that he never sent any of the Comcast information to CM to prove that the debt had been reduced and Plaintiff also admits that he never contacted Comcast in order to resolve the issue, saying he "didn't worry about it." *Id.* at 21 (26:13-21); 29 (60:1-15). Finally, Plaintiff admits that he never requested, in writing, as required by § 1692c(c) of the FDCPA, that CM stop calling him. *Id.* at 34 (79:18-22).

71.     Even after reviewing all of the facts and inferences that can be drawn from this evidence in a light most favorable to Plaintiff, he still fails to raise a material issue of fact as a matter of law. Similar to *Clingaman*, Plaintiff has not alleged, and does not appear to rely upon, an improper pattern of calls to prove a violation of the FDCPA. Plaintiff has not complained that CM called too early in the morning or too late at night, that CM called multiple times in one day or that CM made calls immediately after he hung up the phone. This leaves the Court only to consider the volume of the calls.

72.     Plaintiff alleges that he had eight (8) to ten (10) similar conversations with a CM representative, with only the last conversation differing. Despite his failure to produce his phone records allegedly showing these conversations, instead solely relying on his own testimony, Plaintiff admits that he told each representative that Comcast sent him an email explaining that his debt had been reduced and that he promised the representative that he would send the information to CM at his earliest convenience. However, he never did. Plaintiff took no actions to either resolve the issue with Comcast or CM or to have CM stop calling him, such as making a written request to cease communications as required by the FDCPA. *See* 15 U.S.C. § 1692c(c).

73.    As a result, even in the most favorable light to Plaintiff and viewing CM's undisputed evidence, the Court is faced with eight (8) to ten (10) alleged conversations in twenty-three (23) days. CM never called more than once in a day and did not leave any voice messages. In the alleged conversations, Plaintiff admits that he repeatedly promised to send the Comcast information which could have ended the calls, but he never did. Plaintiff further admits that the CM representatives never called him any names, never cursed at him and never threatened to take his property or have him arrested. Based on the small number of calls, Plaintiff's conduct in refusing to send the relevant information and the total lack of the required oppressive conduct, the evidence only leads to one reasonable conclusion: that CM was only contacting Plaintiff in an attempt to collect his debt; not with the intent to annoy, harass or abuse him. Plaintiff's claim under § 1692d(5) should be dismissed at summary judgment.

2.    Plaintiff has Failed to Show that CM Made Any False Representations.

a.    *CM Did Not Misrepresent the Debt Amount in violation of § 1692e(2)(A).*

74.    Subsection 1692e(2)(A) prohibits the "false representation" of "the character, amount, or legal status of any debt." In determining whether a statement is false, deceptive or misleading so as to constitute a violation of any of the provisions of 15 U.S.C.A. § 1692e, the court "must evaluate any potential deception in the letter under an unsophisticated or least sophisticated consumer standard. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The Court must "assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors." *Goswami  v. Am. Collections Enter., Inc.,* 377 F.3d 488, 495 (5th Cir. 2004). "At the same time we do not consider the debtor as tied to the very last rung on the [intelligence or] sophistication ladder." *Id.* (internal quotation marks omitted) (alteration in original). "This standard serves the dual purpose of protecting all consumers, including the inexperienced, the untrained and the

credulous, from deceptive debt collection practices and protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials." *Taylor v. Perrin, Landry, deLaunay & Durand,* 103 F.3d 1232, 1236 (5th Cir. 1997).

75.     Ordinarily, this is the kind of question which would be answered by the jury. *Beattie*, 754 F. Supp. at 392. Nevertheless, Congress has indicated a desire for the courts to lend structure to the confines of practices prohibited by the Act. *Id.* (citing S. Rep. No. 95-382, 95th Cong., 1st Sess. 4, *reprinted in* 1977 U.S. Code Cong. & Admin. News 1695, 1698; *Jeter,* 760 F.2d at 1179). Thus, courts may resolve the question as a matter of law in appropriate cases. *See Jeter*, 760 F.2d at 1179-80.

76.     In addition to whether a representation would mislead the least sophisticated consumer, the term "false representation," seems to imply that the subsection prohibits intentional conduct. *Beattie v. DM Collections, Inc.*, 754 F. Supp. 383, 392 (D. Del. 1991). The FDCPA was intended to protect consumers from abusive and unfair debt collection practices *"without imposing unnecessary restrictions on ethical debt collectors." Beattie*, 754 F. Supp. at 392 (citing S. Rep. 382 95th Cong., 1st Sess. 2-3 *reprinted in* 1977 U.S. Code Cong. & Admin. News 1695, 1696 (emphasis added)). Consequently, there is room within the Act for ethical debt collectors to make occasional unavoidable errors without subjecting themselves to automatic liability. *Beattie*, 754 F. Supp. at 392. Thus, the Court should consider whether CM *intended* to make a false representation before holding it liable under § 1692e.

77.     For example, in *Smith v. Transworld Systems, Inc.*, the collector, Transworld, sought to collect an amount that was $10.00 more than that actually owed. 953 F.2d 1025, 1032 (6th Cir. 1992). Both parties agreed that the discrepancy was due to the creditor incorrectly listing the amount when it referred the debt to Transworld. *Id.* Nevertheless, Smith still asserted a violation

of § 1692e(2)(A), claiming that Transworld should have conducted an independent investigation of the debt to determine its accuracy. *Id.* The district court determined, and the Sixth Circuit agreed, that the FDCPA does not require an independent investigation. *Id.* "Accordingly, because Transworld's use of an incorrect collection amount was not intentional" and because the court found a bona fide error, the court rejected Plaintiff's § 1692e(2)(A) claim. *Id.*

78.     The *Transworld* opinion is supported by the general proposition that a debt collector may rely upon information provided by a creditor who has provided accurate information in the past. *See Clark v. Capital Credit & Collection Serv.*, 460 F.3d 1162, 1174 (9th Cir. 2006) (citing *Bleich v. Revenue Maximization Group, Inc.*, 233 F. Supp. 2d 496, 500-01 (E.D.N.Y. 2002); *Beattie*, 754 F. Supp. at 392); *see Howe v. Reader's Digest Ass'n, Inc.*, 686 F. Supp. 461, 467 (S.D.N.Y. 1988). Further, a debt collector is not required "to vouch for the validity of the underlying debt." *Chaudhry v. Gallerizzo,* 174 F.3d 394, 406 (4th Cir. 1999).

79.     In *Bleich v. Revenue Maximization Group*, the plaintiff, Bleich, claimed that Revenue violated §§ 1692e, 1692e(2)(A) and 1692e(10) of the FDCPA when it falsely represented in a collection letter that Bleich's $25 debt was in arrears, when, in fact, it had been paid. 233 F. Supp. 2d at 497-98. Despite her allegation, the court noticed that while Bleich disputed the validity of the debt, she did not take advantage of the statutory debt validation procedure outlined in § 1692g of the statute. *Id.* at 498. The court reasoned that "[h]ad Plaintiff exercised her rights under the FDCPA to obtain debt verification, it is entirely likely that litigation would have been avoided." *Id.* at 500. "Indeed, this is likely the reason Congress chose to include the debt validation procedure in the Act. The specific procedure for debt validation must have been intended to avoid FDCPA litigation based solely on the debt's validity as communicated to the

collection agency by the creditor."[14] *Id.*; *see Carpenter v. RJM Acquisitions, LLC*, 2011 WL 2148382, No. 10-4252 (D. Minn. May 31, 2011) ("A consumer cannot circumvent the statute's procedural device to dispute the validity of a debt by filing an action pursuant to § 1692e on the sole basis that the debt is invalid.").

80.     In the present case, Plaintiff claims that CM representatives "stated varying amounts of the alleged balance owed between $400.00 and $300.00, and when Plaintiff indicated he had written proof from the creditor that the amount owed was actually $32.00, Defendant's collectors stated, 'Well, we still have to collect the full amount due and you're obligated to pay it.'" Def. App. at 5. On this basis, Plaintiff alleges that CM violated § 1692e(2)(A). However, Plaintiff has not presented any evidence establishing his allegations. There is no evidence that CM stated varying amounts for the debt and there is no evidence that a CM representative made the alleged statement. Without this, Plaintiff cannot succeed on this claim.

81.     Furthermore, and in the alternative, Plaintiff has not proven a false representation that would potentially deceive the least sophisticated consumer. Plaintiff testified that after canceling his Comcast cable service, he received an email from Comcast stating that he owed approximately $400 for equipment despite the fact that the bulk of the equipment had been retrieved by Comcast. Def. App. at 34 (78:5-16). Plaintiff called Comcast to resolve the issue and was told that the receipt of the equipment must not have yet been logged into the computer at the warehouse, but that when done so, such receipt would be reflected on his account. *Id.* However, at that time, Plaintiff knew that his wife had refused to return Comcast's modem because she did not know which one was theirs. *Id.* at 29 (60:16-23). Plaintiff claims that the

---

[14] "The court can understand, and indeed, sympathize with the frustration experienced by the Plaintiff when she continually received invoices seeking payment that had already been made. That frustration must have only escalated when the Hospital ignored documentation showing that the debt had been paid. Nonetheless, Revenue was not involved at that point in time and was entitled to rely, in the first instance, on the Hospital's representation that the debt was valid." *Bleich*, 233 F. Supp. 2d at 500.

modem was eventually returned, although it is unclear when this occurred, but that Plaintiff received another email evidencing Comcast's receipt of the equipment. *Id.* at 20-21 (25:1-26:12). Thus, Plaintiff knew the reason for the disparity in the amount CM was attempting to collect and the amount he actually owed. *See id.*

82.     When CM contacted him, Plaintiff admits that he "thought it was weird because [he] had just gotten an e-mail from Comcast saying [he] didn't owe that amount…so [he] assumed that Comcast hadn't sent them over the corrected information…" *Id.* at 22 (30:2-14). At this point, the representative made what Plaintiff agrees was a reasonable request – to either pay the amount owed or provide CM with the paperwork from Comcast showing that he did not owe it. *Id.* at 27-28 (53:21-55:3). In fact, at his deposition, Plaintiff testified that he does not have a dispute about the fact that CM asked for the paperwork; instead, he is simply upset about the conversation. *Id.*

83.     Under the present facts, even the least sophisticated consumer would not have been deceived or mislead by CM's alleged representation. Even the most inexperienced, untrained and credulous consumer, having multiple emails from the creditor showing a different balance, would not have believed that he or she was required to pay the amount CM sought to collect. CM did not call and belligerently demand payment of the debt either; the representatives repeatedly asked Plaintiff to send in the receipts so that it could clarify the amount owed. There was no deception here.

84.     Additionally, Plaintiff has presented no evidence that CM intentionally made false representations in an attempt to deceive or mislead him. In fact, Plaintiff believes to the contrary, testifying that he "assumed Comcast hadn't sent [CM] [sic] the corrected information," and that he has no reason to believe CM intentionally misstated the amount of the debt. Def. App. at 22 (30:2-14); 33 (77:11-14); 34 (79:7-10). Plaintiff believes that the inaccuracy in the account

originated with Comcast and that it was Comcast's mistake. *Id.* at 33 (77:15-17); 34 (78:17-79:2). Plaintiff has no reason to believe that CM was intentionally trying to cause him harm. *Id.* at 34 (79:3-6). Similar to the facts in *Transworld*, Plaintiff states that Comcast made the mistake by sending the initially-owed amount to CM and, because of this, CM did not intentionally make a false representation.

85.     Finally, like the plaintiff in *Bleich*, Plaintiff has brought a § 1692e claim without taking advantage of the statutory debt validation procedure outlined in the § 1692g of the FDCPA. Upon receiving a written dispute, § 1692g(b) requires a debt collector to verify the debt he is attempting to collect. *See* 15 U.S.C. § 1692g(b). The purpose of verification is to have the collector confer with the creditor, determine that it is seeking the correct amount and for the collector to confirm this in writing to the consumer. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 406 (4th Cir. 1999) ("verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed"); *Clark*, 460 F.3d at 1173. Had Plaintiff used this procedure, it is almost certain that this litigation would have been avoided.

86.     Because Plaintiff has failed to show any deception by CM, because any false representations were wholly unintentional and because Plaintiff failed to follow the procedures provided by the FDCPA, his claim under § 1692e(2)(A) should be dismissed.

> b.     *CM Did Not Employ Deceptive Means in violation of § 392.304(a)(19).*

87.     Section 392.304 of the Texas Debt Collection Action ("TDCA") prohibits a debt collector from "using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." Tex. Fin. Code § 392.304(a)(19). Despite Plaintiff's failure to clarify his cause of action under this provision, CM presumes that it is based on the

same facts as his claim under § 1692e(2)(A) because both prohibit false representations. *See Prophet v. Myers*, 645 F. Supp. 2d 614 (S.D. Tex. 2008) ("the conduct made unlawful by [the TDCA] is virtually identical to the conduct made unlawful by the FDCPA"). Since these two statutes are substantially similar, the Court should dismiss Plaintiff's TDCA claim for the same reasons explained above regarding Plaintiff's § 1692e(2)(A) claim.[15]

    c.  *CM Used No Other False Representations Violating § 1692e(10).*

88.  Plaintiff alleges the CM violated § 1692e(10) of the FDCPA which prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." *See* 15 U.S.C. § 1692e(10). However, the conduct which Plaintiff alleges violated this provision is not separate or distinct from that already raised as a claimed violation of other sections of the Act, particularly § 1692e(2)(A). Unfortunately, "a mere reallegation of violations of other sections of the FDCPA is not sufficient to constitute a violation of § 1692e(10)." *Dutton v. Wolhar*, 809 F. Supp. 1130, 1140 (D. Del. 1992) (citing *Beattie*, 754 F. Supp. at 394). Because Plaintiff has not based this violation on some new or different action, Plaintiff's claim under this provision should be dismissed.

    3.  <u>CM Provided the Notices Required by § 1692g(a).</u>

89.  In his Complaint, Plaintiff alleges that "Defendant failed to provide Plaintiff with any written notice whatsoever regarding the alleged debt as it pertain[s] to Plaintiff's statutory right to dispute the alleged debt, or any portion thereof, and to request validation of same, within the required statutory period." <u>Def. App.</u> at 5. Plaintiff claims that this purported failure constitutes a violation of § 1692g(a) of the FDCPA. *Id.*

---

[15] Section 392.202 describes the procedure for a consumer to dispute the amount of a debt and have the collector investigate its accuracy, similar to § 1692g. *See* Tex. Fin. Code § 392.202.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**      41

90.     In support of this allegation, Plaintiff testified that he did not receive any letters from CM until "maybe two weeks, ten, 12 days maybe after the last conversation between [himself] and the supervisor," which took place on August 5, 2010. *Id.* at 30 (65:1-10). However, at his deposition, Plaintiff was unable to recall the date on the letter and what it said. *Id.* at 30-31 (65:11-66:22). Plaintiff only recalls that he received it long after his last phone call with CM; ignoring the fact that he testified that the address on the letter was his correct home address for over two years, it was the address at which the Comcast equipment was located, and that he had worked offshore for longer than his usual fourteen (14) day cycle at the time of the letters and calls. *Id.* at 74; 20 (23:22-24:13); 34 (81:3-8). Contrary to Plaintiff's unsupported claim, CM's account notes show that an initial letter was sent to Plaintiff on July 13, 2010, one day before CM attempted to contact Plaintiff. Def. App. at 68-72. The letter was based on the attached form letter, which provided all of the required information. *See id.* at 74.

91.     Despite Plaintiff's claim, such a failure to send a letter, even if it occurred, does not constitute a violation of the FDCPA. Section 1692g(a) of the FDCPA states the following:

> Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing –
>
> [1-5 omitted]

*See* 15 U.S.C. § 1692g(a). In other words, within five (5) days after the first time a debt collector communicates with the consumer, the debt collector shall send the consumer a written notice that includes the five (5) listed items, unless the five (5) listed items were included in the first communication with the consumer or the consumer pays the debt within those five (5) days. As further clarification, the FDCPA defines the term "communication" as meaning "the conveying

of information regarding a debt directly or indirectly to any person *through any medium*." 15 U.S.C. § 1692a(2) [emphasis added].

92.     Based upon a plain reading of the statute, § 1692g(a) only requires a debt collector to send a written notice including the five (5) listed items when its first contact with the consumer, be it written or verbal (hence "any medium"), fails to provide the five (5) listed items. This means that the described "written notice" is only required when the first letter or phone call to the consumer does not explain the listed elements. As mentioned above, Plaintiff merely complains that he was never provided "with any written notice whatsoever." But as explained, CM is not required to provide Plaintiff with any written notice under § 1692g(a). Plaintiff has not alleged that his initial communication with CM was devoid of the five (5) listed items and there is no evidence of its absence. Because Plaintiff's allegation and evidence do not demonstrate a violation of § 1692g(a), this claim should be dismissed at summary judgment.

**C.     Plaintiff has Failed to Prove His Claim Under the DTPA.**

93.     Plaintiff further alleges that CM "made numerous material misrepresentations" in its attempt to collect his debt and that CM "knew or should have known" that its representations were false, acted with reckless disregard for the truth or falsity of the representations, or acted maliciously and in willful, wanton and reckless disregard for Plaintiff's rights. Def. App. at 8. As a result, Plaintiff claims that CM violated Texas' DTPA, Tex. Bus. & Com. Code § 17.41, and that this violation was the producing and proximate cause of economic and mental anguish damages. *Id.* at 9.

94.     The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). To maintain a cause of action for violation of the DTPA, a plaintiff must prove: 1) that he is a consumer; 2) the defendant used or

employed a false, misleading, or deceptive act or practice that is specifically enumerated in Section 17.46(b) and relied on by a consumer to the consumer's detriment; and 3) said violation was a producing cause of economic damages or damages for mental anguish. Tex. Bus. & Com. Code §§ 17.41-17.63; *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). Section 17.46(b) contains a "laundry list" of specifically prohibited acts, including making representations that goods or services have characteristics which they do not have, representing that goods or services are of a particular…quality,…if they are of another, and representing that an agreement confers or involves rights, remedies or obligations which it does not have or involve, among many others. *See* Tex. Bus. & Com. Code. § 17.46(b) *et seq*. However, in the present case, not only has Plaintiff failed to specifically allege a laundry list violation, he also has failed to meet other elements required for his DTPA claim.

95.      First, as explained above, Plaintiff has failed to present any evidence that CM "knew or should have known" that any of its alleged representations were false, as he claims. Plaintiff has also failed to show that CM in any way acted in reckless disregard towards the truth or falsity of any of its representations and Plaintiff certainly presents no evidence that CM acted maliciously or in willful, wanton disregard towards Plaintiff's rights. In fact, the only evidence Plaintiff presents of a representation at all is his own testimony that he received a phone call from CM in which a representative said "[he] had a debt with Comcast for approximately $400…" *See* <u>Def. App.</u> at 22 (30:2-8). But immediately following this statement, Plaintiff explains that "[he] thought it was weird because [he] had just gotten an e-mail from Comcast saying that [he] didn't owe that amount. And so [he] assumed that Comcast hadn't sent them over the corrected information…" *See id.* Thus, Plaintiff himself admits that it is unlikely that CM knew about the

different debt amount, much less that CM acted maliciously or in reckless disregard towards that information.

96.     Plaintiff's second failure under his DTPA claim results from his total lack of evidence showing that he, in any way, relied on CM's allegedly false representations to his detriment. There is no evidence Plaintiff took any action, refrained from acting, or suffered any loss as a result of relying on CM's statements. Finally, as further explained below, Plaintiff has failed to present evidence that CM's alleged misrepresentations were the producing cause of any real damage to Plaintiff. Plaintiff admits that he was not out of pocket any money and supplies no evidence demonstrating a substantial disruption in his daily routine as required by Texas law. Def. App. at 35-36 (86:12-91:6; 91:19-21). As a result, Plaintiff's DTPA claims should be dismissed at summary judgment.

**D.      Plaintiff has Failed to Prove His Damages Claims.**

       1.     <u>Plaintiff Presents No Evidence of "Actual Monetary Loss" under the TCPA</u>.

97.     Section 227(b)(3)(B) permits a person to bring suit to recover any "actual monetary loss" resulting from the violation of the TCPA or "$500 in damages for each such violation, whichever is greater." *See* 47 U.S.C. § 227(b)(3). In his Original Complaint, Plaintiff requests an award of "actual damages" under the TCPA. Def. App. at 7. But as can be seen, the TCPA does not allow recovery of "actual damages," but "actual monetary loss." As a result, Plaintiff must present evidence showing that he suffered such a loss as a result of the alleged TCPA violation. He has not.

98.     At his deposition in this case, Plaintiff was asked, "Have you been out of pocket any money as a result of these calls?" Def. App. at 36 (91:19-21). Plaintiff responded, "I don't believe I have." *Id.* Based on his own admission, Plaintiff has not suffered any "actual monetary

loss" as a result of the calls he claims violated the TCPA. Therefore, his request for "actual damages" under the TCPA should be dismissed at summary judgment.

> 2.    There is No Evidence CM Knowingly or Intentionally Violated the TCPA.

99.    The TCPA and Texas law allow for what are, essentially, exemplary damages by allowing the court, in its discretion, to increase the amount of the award to "not more than 3 times" the actual monetary loss or $500 if it is found that the defendant acted intentionally, willfully or knowingly.[16] *See* 47 U.S.C. § 227(b)(3); Tex. Bus. & Com. Code § 305.053. The Fort Worth Court of Appeals, in *Manufacturer's Auto Leasing v. Autoflex Leasing,* determined that the standard for "willful or knowing" violations under the TCPA was that the person have reason to know, or should have known, that his conduct would violate the statute. 139 S.W.3d 342, 346 (Tex. App.—Fort Worth, 2004, pet. denied) "Therefore," the court explained, "the TCPA is willfully or knowingly violated when the defendant knows of the TCPA's prohibitions, knows he does not have permission to send a fax ad to the plaintiff, and sends it anyway." 139 S.W.3d at 346.

100.    In this case, Plaintiff admitted that he had an account with Comcast for cable/internet services. Def. App. at 34 (78:5-7). Plaintiff also could not recall whether he provided his cell phone number to Comcast when he contracted for their services. *Id.* at 23 (35:14-16). However, CM received Plaintiff's cell phone number from Comcast with the rest of Plaintiff's contact and debt information. *Id.* at 70; 68 (Affidavit – received # from Comcast). Because "the provision of a cell phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior

---

[16] 47 U.S.C. § 227(b)(3) of the TCPA contains a "willfully or knowingly" standard. Tex. Bus. & Com. Code § 305.053 contains a "knowingly or intentionally" standard. Pursuant to the above explanation that the TCPA must be applied through Texas law, the "knowingly or intentionally" standard in the Texas Business and Commerce Code controls. However, because the terms "gross negligence," "knowing," "willful," and "intentional" all "lie on a continuum with gross negligence being the lowest mental state and intentional being the highest," then the fact that the statutes differ on the higher-end standard creates no substantial discrepancy. *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115, 118 (Tex. 1984). Both statutes can be satisfied by "knowing" conduct or anything above that on the spectrum.

express consent by the cell phone subscriber to be contacted at that number regarding the debt" and because calls "placed by a third party collector on behalf of [the] creditor are treated as if the creditor itself placed the call," CM had every reason to believe Plaintiff consented to calls on his cellular telephone. *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. at 564-65. At the very least, CM did not know that it did not have permission to contact Plaintiff at that number.

101.    At his deposition, Plaintiff admitted that he had no reason to believe that anyone at CM was intentionally trying to harm him. <u>Def. App.</u> at 34 (79:3-10). And Plaintiff has offered no evidence that CM knew it did not have permission to call him or that CM knew that calling him would violate the TCPA. Thus, Plaintiff has failed to prove that CM intentionally, willfully or knowingly violated the TCPA or § 305 of the Texas Business and Commerce Code.

       3.     <u>Plaintiff has Failed to Prove Actual Damages under the FDCPA.</u>

102.    The FDCPA permits a person to recover "any actual damages sustained" and "additional damages as the court may allow, but not to exceeding $1,000." 15 U.S.C. § 1692k(a). Actual damages under the FDCPA include mental anguish, *McGrady v. Nissan Motor Acceptance Corp.*, 40 F. Supp. 2d 1323, 1338 (M.D. Ala. 1998), and emotional distress, *Teng v. Metropolitan Retail Recovery, Inc.*, 851 F. Supp. 61, 68 (E.D.N.Y. 1994) as well as economic damages. *Nelson v. Equifax Info. Servs.*, LLC, 522 F. Supp. 2d 1222, 1234-35 (C.D. Cal. 2007).

103.    As mentioned above, Plaintiff admitted that he is not out-of-pocket any money as a result of CM's actions. <u>Def. App.</u> at 36 (91:19-21). Therefore, he has no claim for economic damages in this case. Instead, he is limited to making a claim for intangible losses, which are discussed below.

104.    To recover damages for mental or emotional distress under the Fair Credit Reporting Act, a statute similar to the FDCPA, the Fifth Circuit demands "proof of actual injury" requiring "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 371 (5th Cir. 2001); *Washington v. CSC Credit Services, Inc.*, 199 F.3d 263, 268 n. 4(5th Cir. 2000) ("The FDCPA contains a similar civil liability provision to the FCRA…"). "Where…the plaintiff's own testimony is his only evidence of emotional damages, he must explain the circumstances of his injury in reasonable detail and not rely on conclusory statements, unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional from the defendant's action." *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004) [citations omitted].

105.    In *Sloane v. Equifax Information Services, LLC*, the Fourth Circuit determined that while "a plaintiff's testimony can provide sufficient evidence to support an emotional distress award, we have required a plaintiff to reasonably and sufficiently explain the circumstances of the injury and not resort to mere conclusory statements." 510 F.3d 495, 503 (4th Cir. 2007) [quotations omitted]. The court pointed out a number of factors which should be considered when making such an award, such as:

- the factual context in which the emotional distress arose;

- evidence corroborating the testimony of the plaintiff;

- the nexus between the conduct of the defendant and the emotional distress;

- the degree of such mental distress;

- mitigating circumstances, if any;

- physical injuries suffered due to the emotional distress;

- medical attention resulting from the emotional duress;

- psychiatric or psychological treatment; and

- the loss of income, if any.

*See Sloane*, 510 F.3d at 503. The court warned that "[n]ot only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Id.* Thus, a court must "distinguish[] between plaintiff testimony that amounts only to 'conclusory statements' and plaintiff testimony that 'sufficiently articulates' true 'demonstrable emotional distress.'" *Id.* (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996)).

106.    In *Cousin*, the plaintiff's only evidence of emotional distress was that he was "real frustrated and irritated," he was "very upset, angry," he "[f]elt like nobody was listening," and he "felt like, if you [k]now anything about a maze, it's like being trapped inside of something that you can't get out of." 246 F.3d at 370-71. The Fifth Circuit found this testimony to be insufficient to support the plaintiff's award for emotional distress. *Id.* at 371.

107.    Similarly, in *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938-39 (5th Cir. 1996), the plaintiff presented the following testimony in support of his claim for emotional distress:

> [He] testified that he felt "frustrated" and "real bad" for being judged by the color of his skin. [He] explained that the work environment was "unbearable" and was "tearing [his] self-esteem down." [He] also stated that it "hurt" and made him "angry" and "paranoid" to know that his supervisor referred to [him] as a "porch monkey" or a "nigger" and generally though that he was inferior to white employees.

However, the Court found this testimony was insufficient to support the district court's $40,000 emotional distress award and, accordingly, vacated it. *Id.*

108.    In considering the *Sloane* factors, CM points out that Plaintiff admitted that he received an email from Comcast stating that he owed approximately $400 for unreturned equipment even though the bulk of the equipment had been recently returned. <u>Def. App.</u> at 20 (25:1-21); 29

(60:16-25); 34 (78:5-16). Plaintiff also knew that his wife had refused to return Comcast's modem because she did not know which one was theirs, so he still had an outstanding balance. *Id.* at 29 (60:16-23). Plaintiff claims that the modem was eventually returned, although it is unclear when this occurred, but that Plaintiff received another email evidencing Comcast's receipt of the equipment. *Id.* at 20-21 (25:1-26:12). Nonetheless, Plaintiff knew that there was a financial issue pending between himself and Comcast and is hard-pressed to argue that hearing about it from CM caused him mental anguish or emotional distress. In fact, when Plaintiff was asked why he did not call Comcast to clarify the matter, he answered:

> In the past when a company had a misunderstanding of this nature, it was usually cleared up within a few weeks, ***so I didn't worry about it***.

Def. App. at 21 (26:17-21) [emphasis added]. This is directly contrary to his claim for mental anguish.

109.    As for the nexus and degree of Plaintiff's distress, Plaintiff began his deposition testimony with the broad assertion that "I believe they violated my rights," although he could not specifically articulate those "rights" to which he was referring. Def. App. at 19 (21:19-23). Later, when referring to the conversations he had with CM representatives, Plaintiff states that while he did not get frustrated or angry on the first conversation, he did eventually get frustrated with a representative at some point. *Id.* at 22 (32:3-7). When asked how he suffered mental anguish, Plaintiff explained:

> [Y]ou know, I just know that, you know, the time that I've had to spend conversating [sic] with my attorney when I could be spending it with my family or spending – you know, talking on the phone with these people when I'm supposed to be working or at work, you know, it's disrupting my daily routines.

*Id.* at 31 (68:10-69:4). However, moments later, Plaintiff admits that the 22 minutes total he spent on the phone with CM took place while he was at work, which he defines as either "at

work resting or…at work working." (because Plaintiff works "offshore," it appears that he considers any time that he is not at home as being "at work"). *Id.* at 32 (70:9-71:7).

110.    Plaintiff was asked again what he meant by mental or emotional anguish, Plaintiff explained:

> That I've had to take time out to explain myself over and over again in the situation that I've explained on the very first conversation and that it's, you know, troublesome and tiresome. You know, I'm laying awake at night wondering, you know, what's going to transpire by all of this when it's – and I haven't done anything wrong.

*Id.* at 32 (71:22-72:7). Following this explanation, Plaintiff admits that he sought no medical assistance for his emotional distress, never saw a doctor, received no diagnoses, sought no counseling from a professional counselor or psychologist, engaged in no informal counseling and did not seek pastoral care. *Id.* (72:8-73:10). Instead, Plaintiff simply claims that he had to take some over-the-counter sleeping pills since the calls occurred. *Id.* (73:11-20). But when asked about the duration of his self-administration of these pills, Plaintiff first said that he took them once-a-week for almost a year, then explained that it was only once-a-month after the calls stopped on August 5, 2010 (which was 23 days after they began on July 14, 2010). *Id.* at 33 (74:6-22). Otherwise, Plaintiff offers no other testimony or evidence showing he suffered from mental anguish or emotional distress. *See id.* at 35-36 (86:23-91:6).

111.    Plaintiff has presented no evidence that CM willfully or knowingly made false representations in an attempt to deceive or mislead him. In fact, Plaintiff believes to the contrary, testifying that he "assumed Comcast hadn't sent [CM] [sic] the corrected information," and that he has no reason to believe CM intentionally misstated the amount of the debt. Def. App. at 22 (30:2-14); 33 (77:11-14); 34 (79:7-10). Plaintiff believes that the inaccuracy in the account originated with Comcast and that it was Comcast's mistake. *Id.* at 33 (77:15-17); 34 (78:17-

79:2). Plaintiff has no reason to believe that CM was intentionally trying to cause him harm. *Id.* at 34 (79:3-6). Similar to the facts in *Transworld*, the parties agree that Comcast made the mistake by sending the initially-owed amount to CM and, because of this, CM did not intentionally, willfully or knowingly make a false representation.

112.     Finally, and most importantly, as a mitigating circumstance, Plaintiff could have either disputed the debt in writing as required by the FDCPA or simply sent in the information he received from Comcast as he promised to do several times. During the very first telephone call on July 14, Plaintiff told CM's representative that he had received an email from Comcast showing that he only owed $32.00 and when asked if he would send it to CM, he said he would fax it over. Def. App. at 71; 21 (26:3-12). But he never did. Such action would have resolved this entire matter, but Plaintiff refused. As a result, he should not be permitted to make a claim for mental anguish or emotional distress when he could have prevented it. Plaintiff's request for mental anguish/emotional distress damages is insufficient as a matter of law and should be denied at summary judgment.

                    4.     Plaintiff has Failed to Prove His Damages under Texas Law.

113.     The TDCA requires a plaintiff to prove that he has suffered "actual damages sustained as a result of a violation of this chapter." *See* Tex. Fin. Code § 392.403(a)(2); *see Elston v. Resolution Servs.*, 950 S.W.2d 180, 185 (Tex. App.–Austin 1997, no writ). In addition, "[a] consumer must, in order to prevail on a DTPA claim, also establish that each defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's injury." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996).

114.     A typical definition of mental anguish given by trial courts is as follows:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or

> embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "It is nevertheless clear that an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Id.* When plaintiffs fail to produce this evidence, "we apply traditional 'no evidence' standards to determine whether the record reveals any evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.*

115.    "Simply because a plaintiff says he or she suffered mental anguish does not constitute evidence of the nature, duration, and severity of any mental anguish that is sufficient to show a substantial disruption of one's daily routine." *Gonzalez v. Temple-Inland Mortg. Corp.*, 28 S.W.3d 622, 626 (Tex. App – San Antonio 2000, no pet.). Testimony in support of mental anguish damages must provide specific details of the nature, duration and severity of the mental anguish. *Gonzalez*, 28 S.W.3d at 626. Conclusory statements are not sufficient. *Id.*

116.    As explained above, at his deposition, Plaintiff made the conclusory statement that "talking on the phone with these people when I'm supposed to be working or at work, you know, it's disrupting my daily routines." Def. App. at 31 (68:10-69:4). Later, Plaintiff testified that the situation was "troublesome and tiresome" and that he would "lay[] awake at night wondering…what's going to transpire." *Id.* at 32 (71:22-72:7). But Plaintiff also testified that his wife is not angry or upset with him about the calls, his marriage is good, that he was able to engage in normal work cycles, that this matter did not impact his ability to spend time with his family, did not interfere with his hobbies, and that other than occasionally being unable to sleep,

the matter did not interfere with his day-to-day activities. *Id.* at 35-36 (86:23-91:7). Plaintiff sums up his real feelings on the issue when he said that after receiving the first call from CM, he "didn't worry about it." *Id.* at 21 (26:13-21).

117.    Based on this uncorroborated testimony, Plaintiff has failed to provide the direct evidence of the nature, duration, and severity of his mental anguish as required by Texas law and has certainly failed to establish that he experienced a substantial disruption in his daily routine. As a result, Plaintiff's claims for actual damages under his Texas causes of action should be dismissed at summary judgment.

## IV.

## <u>CONCLUSION</u>

118.    It is undisputed that Plaintiff owed Comcast a debt for unreturned equipment. Comcast contacted Plaintiff and informed him of this debt. Plaintiff returned some of the equipment just before CM began trying to collect the unpaid amount. Instead of simply sending CM the paperwork he received from Comcast showing the reduction in the amount owed, Plaintiff refused and allowed the calls to continue. Now he sues CM for numerous unfounded claims. However, Plaintiff has failed to present vital evidence supporting his claims. Because of this, Plaintiff's claims should be dismissed in their entirety at summary judgment.

WHEREFORE, PREMISES CONSIDERED, Defendant Credit Management, LP, respectfully requests that the Court Grant its Motion for Summary Judgment of Plaintiff's claims in their entirety and for such other and further relief as it may show itself justly entitled.

Respectfully submitted,

**ROBBIE MALONE, PLLC**


/s/Robbie Malone
ROBBIE MALONE
State Bar No. 12876450
JACOB C. BOSWELL
State Bar No. 24061269
Northpark Central, Suite 1850
8750 North Central Expressway
Dallas, Texas 75231
(214) 346-2625
(214) 346-2631 FAX
E-mail: rmalone@rmalonelaw.com

ATTORNEY FOR DEFENDANT


<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the foregoing document has been forwarded via ECF on this 5th day of August, 2011 to:

Noah D. Radbil
Weisberg and Meyers, LLC
5025 N. Central Avenue, #602
Phoenix, AZ 85012

Dennis R. Kurz
Attorney for Plaintiff
WEISBERG & MEYERS, L.L.C.
5025 N. Central Ave., #602
Phoenix, AZ 85012

/s/Robbie Malone